```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF GEORGIA
                       AUGUSTA DIVISION


United States of America,    )
                             )
          Plaintiff,         )
                             )
     vs.                     )    Case No. 1:21CR48
                             )
Sammie Lee Sias,             )
                             )
          Defendant.         )
_____)



                      SENTENCING HEARING
             BEFORE THE HONORABLE J. RANDAL HALL
            CHIEF UNITED STATES DISTRICT COURT JUDGE
               TUESDAY, JUNE 20, 2023; 10:01 A.M.



FOR THE PLAINTIFF:

     Tara M. Lyons, Esquire
     Patricia G. Rhodes, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT:

     Jesse W. Owen, Esquire
     3540 Wheeler Road, Suite 315
     Augusta, Georgia 30909
     (706)426-3110

TRANSCRIBED FROM DIGITAL RECORDING BY:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468
```

1       (Call to Order at 10:01 a.m.)

2           THE CLERK:  Court calls Case No. 1:21CR48.  United

3   States of America v Sammie Lee Sias.  Tara Lyons and Patricia

4   Rhodes for the government.  Jesse Owen for the defendant.  Here

5   for sentencing.

6           THE COURT:  Good morning.

7           MR. OWEN:  Good morning.

8           MS. LYONS:  Good morning, Your Honor.

9           THE COURT:  Sammie Lee Sias appeared before this Court

10  on July 26, 2022, accompanied by his attorneys at that time,

11  Mr. David Stewart and Kenneth Crowder, for a jury trial.  It is

12  noted for the record that Mr. Sias is now represented by

13  Mr. Jesse Owen.  On July 29, 2022, Mr. Sias was found guilty of

14  count one of the indictment charging him with destruction,

15  alteration or falsification of records in a federal

16  investigation in violation of 18 U.S.C. § 1519 and count two of

17  the indictment charging him with false statement or

18  representation made to a department or agency of the United

19  States in violation of 18 U.S.C. § 1001(a)(2).  Subsequent to

20  the jury's verdict this Court directed the probation office to

21  prepare a Presentence Report and to disclose the report to the

22  government and to Mr. Sias.

23          Has the government completed its review of the

24  Presentence Report?

25          MS. LYONS:  Yes, Your Honor.

1           THE COURT:  You have no outstanding objections?

2           MS. LYONS:  None, Your Honor.

3           THE COURT:  Mr. Owen, have you and Mr. Sias completed

4    your review of the report?

5           MR. OWEN:  Yes, sir.

6           THE COURT:  You have no outstanding objections?

7           MR. OWEN:  We do not.

8           THE COURT:  There being no objections to the factual

9    statements or to the probation officer's conclusions as to the

10   applicable advisory guidelines contained in the report, the

11   court adopts those facts and conclusions and announces that the

12   applicable federal advisory guidelines are total offense level

13   20, criminal history category I, 33 to 41 months of

14   imprisonment, one to three years of supervised release, $15,000

15   to $150,000 fine, restitution [sic] of $200 which is $100 as to

16   each count.

17           All right.  With the adoption of the guidelines we'll

18   move now into the mitigation phase of the hearing.

19           Mr. Owen, I'll hear from you, and, Mr. Sias, if he

20   wishes to speak he has the right to say something, but,

21   nevertheless, I'll hear from you from the podium.  If the two

22   of you will come to the podium, I'll be glad to hear from you.

23           MR. OWEN:  And, Your Honor, I think we would open with

24   Mr. Sias' statement.  He does have a statement he would like to

25   make to the Court and we would open with that.

1           THE COURT:  Mr. Sias, that is your right.  You may

2   proceed.

3           THE DEFENDANT:  Thank you, Your Honor.  I appreciate

4   the opportunity to address the Court today in reference to my

5   conviction of these charges.  First off, as a guy that's spent

6   a lot of time in the Army, I accept accountability and

7   responsibility as the natural order of the day.  This action

8   here would not have occurred without me having performed the

9   actions as something that's so directed and that -- and for

10  that, that is my fault.

11          I would like to add a couple of other points to this

12  presentation, if I may, Your Honor.

13          THE COURT:  Yes, sir.

14          THE DEFENDANT:  I have a combined service of

15  approximately 62 years to the military, my country, and my

16  community combined.  Part of it was concurrent.  I spent 28

17  years in the United States Army and I served my community for

18  approximately 34 years and there were many things that I'm very

19  proud of that I accomplished during that time, but first I must

20  say as a seasoned and veteran soldier my method in presenting

21  and doing was always straightforward, get it done.  As the

22  motto was failure is not an option; however, I am now facing a

23  failure.

24          As far as my military service being able to work with

25  folks, young folks, older folks, and whatever as we had

1    soldiers in this United States Army for making defend our

2    country and make that better, I feel well accomplished in that.

3    When I left the United States Army I had a Top Secret SCI

4    security clearance.  So the Army had confidence in my character

5    and morale at that time.

6          As a community advocate for my community, I served in

7    many roles starting from the very bottom of this just starting

8    to pick up trash in the streets to ensure that we had a

9    community that felt safe, looked safe, and, therefore, you

10   could be safe.  Along with that, we started one of the most

11   successful neighborhood associations that's been in the CSRA in

12   a number of years.  Many other associations in this area have

13   copied our model, have taken advantage that we put in to show

14   that they could work, and I'm very proud of that.

15         That was kind of a segue into the fact that I became

16   an elected official.  As an elected official it was my goal and

17   my motto to ensure that we could make Augusta-Richmond County

18   and the CSRA better for many of our residents and folks that

19   lived here and some things were tough for the public to

20   swallow, but I felt like I had the fortitude and the guts to go

21   out and sell it.

22         Example:  The storm water program.  Many folks refer

23   to it as a rain tax, but that was certain benefits to that and

24   we really needed to get that done.  We were the only community

25   in the area that did not have one, but it was also important to

1  make sure that the public was informed and that there was

2  accountability on how these funds were utilized.  I took it

3  upon myself to be the spokesman for our city along with our

4  engineering department to go out and explain that to our

5  citizens and to have those tough meetings to take those tough

6  questions.  As a soldier I felt I was well equipped to do that.

7  With the education and knowledge of the project and the

8  process, I think we did a very good job of that.

9        I was also very proud of several other things -- our

10 Cyber Center here.  One of the things that the city invested in

11 was a parking deck.  That was quite a venture and quite an

12 expense for the city, but I had the opportunity before we

13 signed the final dotted line -- and I'm not name dropping.  I

14 am simply naming the folks that we negotiated with -- Kevin

15 Rose (phonetic) from Governor Deal's office.  We sat down and

16 we decided and discussed what would be good for Augusta and the

17 state working together to build a great parking deck that could

18 be utilized for the city and for the purpose of the Cyber

19 Center and we would get a return on our money to pay our debts

20 along with the SPLOST and other things and I felt well

21 accomplished of what we got out of that.

22        Another thing was when we talk about the

23 Transportation Act.  Even while I was under scrutiny my

24 colleagues unanimously selected me to represent with the Mayor

25 with the Georgia Department of Transportation to fight our case

1     on that and I think we did fairly well.  We came away from TIA

2     -- we had a budget.  I'm sorry.  We had projects that were

3     predesignated.  We had about $300 million and we came away also

4     with $49.5 million in discretionary spending.  The initial

5     project money mandated that it go to those projects which is

6     great, but, also, it gave the city an opportunity over the next

7     10 years that they could select projects that may not have been

8     included in there, and I feel that there are more examples that

9     I can give.  I know there are more examples I can give you, but

10    I don't want to seem like this is back-patting.  I simply want

11    to inform the Court of the things I have been attempting to

12    accomplish for my community.

13          And moving forward, my sister asked me one thing:  She

14    said, "Sammie, you got to clear the family name."  So in the

15    future, regardless of how this comes, I am committed to do just

16    that and to move forward and continue to do the things that I

17    have done for my community and my family.  Thank you.

18          THE COURT:  Thank you, Mr. Sias.

19          Mr. Owen?

20          MR. OWEN:  Yes, sir.

21          No, you stay here.

22          Judge, one of the things that -- and, I mean, I know

23    you've read the Presentence Report and it's very accurate about

24    Mr. Sias' background.  One of the things I wanted to point out

25    to you is in my career I usually -- I have never represented

1    anybody that got this many awards from the United States Army:

2    The Legion of Merit, the Meritorious Service Award, the Army

3    Commendation Medal, the Army Achievement Medal, the Army Good

4    Conduct Medal, the National Defense Service Medal, the Overseas

5    Service Ribbon, and the Army Service Ribbon and that's just in

6    his Army career.

7           Mr. Sias also is aware and has been made aware

8    recently and we talked about it that if you do impose any

9    confinement in this case as the guidelines call for, it is

10   going to end all of his income.  His income -- personal income

11   -- comes from Social Security and military retirement and it's

12   my understanding that neither one of those are paid to people

13   that are incarcerated in a prison system and so that will deter

14   -- it will stop his income if he does get confinement.

15          If you could see to deviate so far downward as to give

16   him only supervised release, he would be eligible to continue

17   getting that income.  The income is about $70,000 a year and

18   that could be used to pay fines, fees, assessments, and things

19   of that nature which the Court may impose in this case.

20          I do think that we would ask you to consider deviating

21   and lowering and placing him on supervised release.  I think

22   that he is a unique individual that has provided a lot of

23   service and I don't think that that should necessarily be

24   stopped because of these mistakes, and that is our request at

25   this time.  Thank you.

1              THE COURT:  You may have a seat.

2              Ms. Lyons, I'll hear from you on behalf of the

3      government.

4              MS. LYONS:  Thank you, Your Honor.  May I use the

5      podium?

6              THE COURT:  Yes, you may.

7              MS. LYONS:  Thank you, Your Honor.  May it please the

8      Court.  Today the United States is asking for you to sentence

9      Mr. Sias to a term of imprisonment within the calculated

10     guideline range.  Mr. Sias, during his statement to the Court,

11     used the word "accountability" and that's absolutely accurate

12     in this case, Your Honor.  This was a case about

13     accountability.  At first it was about the accountability of

14     funds -- whether or not funds had been misappropriated from the

15     Sandridge Community Association.  Later it became about

16     Mr. Sias' inability to take accountability for his actions.

17             As reflected in the Presentence Report, the evidence

18     presented at trial was straightforward and clear.  The jury and

19     Your Honor learned that in August of 2019 Mayor Hardie Davis

20     requested that the Georgia Bureau of Investigation conduct an

21     investigation into Mr. Sias' possible theft or misuse of SPLOST

22     money.  The FBI then opened an investigation and worked jointly

23     with GBI to investigate whether Mr. Sias had misappropriated

24     those funds.

25             Now the funds in question, Your Honor, totaled

1    approximately $150,000 and were made in three payments between
2    April 2014 and February of 2015.  They were paid to the
3    Sandridge Community Association passing straight into the hands
4    of its President, Sammie Sias.  Mr. Sias was responsible for
5    managing the Sandridge Community Association which met in the
6    Jamestown facility.  During Mr. Sias' 20 years as President of
7    Sandridge, he managed those SPLOST funds for the purpose of
8    improving the Jamestown facility and he had sole control and
9    discretion over how those funds and money was to be spent.

10          In 2019 when the FBI came around asking questions
11   about the spending of those SPLOST funds by Mr. Sias on behalf
12   of Sandridge, it was time for accountability, and when Mr. Sias
13   was asked to provide documentation, proof of payments, Mr. Sias
14   went about destroying, altering, and concealing records and
15   then lying to the FBI about it.

16          In July of 2019 the FBI served then-President
17   Dr. Fason with a subpoena for records from Sandridge.  On
18   August 5 of 2019 the FBI then served Mr. Sias with a subpoena
19   for the Sandridge bank accounts because he was the custodian of
20   those bank account records for Sandridge during the time that
21   the SPLOST money was received.

22          On August 8 of 2019 law enforcement officers executed
23   a search warrant at the defendant's residence looking for
24   documents related to Sandridge, SPLOST, and Jamestown.  The FBI
25   was able to seize documents and electronic devices including

1    the HP laptop that would become the focus of this case.  After

2    the search warrant was executed on August 8, the HP laptop from

3    Mr. Sias' house was forensically examined and as a result the

4    FBI could clearly see that files had been deleted from this

5    laptop.

6            Those files included names such as SPLOST, SPLOST VI,

7    and Sandridge.  Those files had been deleted on August 5 of

8    2019 within hours of Mr. Sias receiving the federal grand jury

9    subpoena for bank records of Jamestown and Sandridge.  Within

10   hours of meeting with Special Agent McKee, Sias deleted over

11   7000 files from the HP laptop.

12           Now on August 9 of 2019 when FBI Special Agent McKee

13   conducted a non-custodial recorded interview of Mr. Sias at

14   Mr. Sias' home he asked Mr. Sias whether or not all records

15   relating to Jamestown, Sandridge, and SPLOST had been turned

16   over, specifically including electronic files.  When Mr. Sias

17   spoke to Special Agent McKee on August 9 he told Special Agent

18   McKee that he had turned over all of the files and he knew this

19   was a lie because he had already deleted those files from his

20   HP laptop.

21           Those were the facts that a jury of Mr. Sias' peers

22   heard before finding him guilty of count one, destroying,

23   altering or falsifying records in a federal investigation and

24   guilty of count two, false statement or representation made to

25   an agency of the United States.  The jury rendered a verdict

1   holding Mr. Sias accountable for destroying records and for

2   lying to Special Agent McKee.

3          Now there are a few things that the United States and

4   the defense can agree on today.  First, no one can deny

5   Mr. Sias' significant military career -- over 20 years as he

6   told Your Honor.  Mr. Owen even mentioned the awards that

7   Mr. Sias had won during his term of service with the military.

8   Second, no one can deny that during his 20-year stint with

9   Sandridge it seemed like he was able to improve the center and

10  be a positive influence in his community, and, third, we can

11  all agree that Mr. Sias was convicted of lying to the FBI and

12  destroying records and that he was not convicted of any of the

13  underlying financial crimes alleged, but that's where the

14  agreements end, Your Honor.

15         First, Mr. Sias' lengthy Army -- military service and

16  awards means that he knew better.  He spent 28 years in the

17  service following rules and procedures, but in 2019 he made a

18  voluntary decision to ignore his lifetime of training by

19  breaking the law.

20         Second, Mr. Sias may have begun his time at Sandridge

21  as a leader, but that's not how it ended.  In the end Mr. Sias

22  began to abuse the authority that had been given to him by the

23  community.  Mr. Sias began to abuse Sandridge and Jamestown as

24  his own personal business.  Mr. Sias determined how Sandridge

25  was run, when it opened, when it closed, how payments were

1   made, and how they were spent.  Mr. Sias did not want this

2   authority challenged, and that's why he decided to delete those

3   files and lie to the FBI on August 9 in 2019.

4          And, finally, although Mr. Sias was never convicted of

5   the financial crimes, it is plain and clear that without the

6   files that Mr. Sias deleted the FBI will never ever be able to

7   complete a financial investigation of the SPLOST funds given to

8   Sias for the Sandridge Community Association.

9          Turning to the PSR, Your Honor, the guidelines in this

10  case have been calculated to be 33 to 41 months in prison.  The

11  Presentence Report for that guideline calculation takes into

12  account that Mr. Sias deleted and altered records from

13  Sandridge and that he lied to the FBI.  It also takes into

14  account Mr. Sias' decision to go to trial and question those

15  charges.  It also takes into account his lack of criminal

16  history, but I would ask Your Honor to also consider the

17  following today when determining an appropriate sentence.

18         The Sandridge Community Association and Jamestown

19  facility belonged and still belong to the citizens of Sandridge

20  community, not Mr. Sias.  The receipts, the logs, the

21  documents, the agendas, and financial documents that Mr. Sias

22  destroyed belong to Sandridge Community Association and

23  Jamestown, not Mr. Sias.

24         What does Mr. Sias' criminal conduct say to the

25  citizens who rented the Jamestown facility, the citizens who

1   held their receptions and events at the Sandridge Community

2   Association, the hard-working parents who paid a fee to send

3   their children to summer camp at Sandridge and Jamestown

4   facility?  The community, these citizens, these parents trusted

5   Mr. Sias to be an upstanding public leader who was supposed to

6   protect their community, supposed to improve their community,

7   supposed to fight for their community, and be a role model to

8   their children.

9        A guideline sentence in this case not only will serve

10  to deter Mr. Sias from committing any similar conduct in the

11  future, but it will also serve to deter others in similar

12  positions of trust from betraying their communities.  It is

13  important for the citizens of Sandridge, Richmond County, and

14  the Southern District of Georgia to know that their trusted

15  public leaders will be held accountable when they engage in

16  illegal conduct. Our community leaders who destroy files that

17  belong to the citizens will be held accountable.  Our community

18  leaders who lie to the FBI when they are under investigation

19  will be held accountable.  No one is above the law.

20        Mr. Sias became part of a community.  He willingly

21  became a leader in that community.  He willingly joined a

22  system that had checks and balances and Mr. Sias knew that

23  there were rules that he needed to follow.  Mr. Sias just

24  decided that he didn't have to play by those rules in August of

25  2019.  He willingly made that choice, and, Your Honor, we now

1    ask you to hold Mr. Sias accountable for breaking those rules.

2         For all of those reasons, Your Honor, the government,

3    therefore, urges you to impose a term of imprisonment that's

4    within the guideline range.  Thank you, Your Honor.

5         THE COURT:  Thank you.  It is important this morning

6    before I announce my sentence to explain what factors led me to

7    arrive at my final sentencing decision.  As I am required by

8    law to do, I evaluated your case under the guidance of the

9    18 U.S.C. § 3553(a) sentencing factors.  Consistent with the

10   history and characteristics of the defendant factor, I

11   considered -- Mr. Sias, I considered your long and

12   distinguished military service to our nation, your leadership

13   of the Sandridge Community Association, and your work at the

14   Jamestown Community Center.  While these were important

15   considerations, they were not the only 3553(a) factors I

16   analyzed.

17        An important factor was the nature and circumstances

18   of the offenses; specifically, destruction, alteration or

19   falsification of records in a federal investigation and false

20   statement or representation made to a department or agency of

21   the United States -- what I call obstruction of justice crimes.

22        As you know a jury of 12 fellow citizens after hearing

23   and considering several days of testimony and a large volume of

24   exhibits returned a unanimous verdict finding you guilty of

25   these offenses.  They determined that you willfully obstructed

1    a federal investigation by destructing or altering evidence and

2    lying to a federal agent.  Standing alone, these are serious

3    offenses.  Our judicial system depends upon the ability of law

4    enforcement and other agencies to conduct thorough

5    investigations into suspected crimes.  In some cases that

6    principle ensures that criminals are held accountable for their

7    conduct, but this principle also helps avoid the prosecution of

8    innocent people due to missing or destroyed evidence.  This is

9    why our Congress passed laws that make obstruction conduct

10   felony offenses, but the conduct -- I'm sorry, the context in

11   which your actions occurred sets this case apart.

12           This investigation began when information was provided

13   to law enforcement that you, a sitting Augusta-Richmond County

14   Commissioner, were engaged in corruption involving your office

15   and the use of SPLOST funds awarded to the Sandridge Community

16   Association for improvements at the Jamestown Community Center.

17   If the goal of your decision to delete and hide computer

18   evidence and then lie to the FBI about that conduct was to

19   hinder that investigation, then evidence disclosed at your

20   trial suggests that your plan worked even if it took the

21   commission of federal crimes to do so.

22           The actual truth of what happened with those tax funds

23   at Jamestown may never be fully known because of your actions

24   in destroying and altering evidence.  That result is simply

25   unacceptable.  Thus, this conduct by a sitting county

1  commissioner and leader of a neighborhood association to cover

2  up for financial misdeeds renders your case far more serious

3  than a garden variety conviction of lying to a federal agent.

4       Today's sentence is also necessary to deter future

5  similar conduct by you and others, to protect the public, and I

6  believe will promote respect for the law.  In a city that has a

7  regrettable history of bad behavior by elected and government

8  officials, this is yet another example of a local elected

9  official generally driven by greed and arrogance breaching the

10  trust of the citizens to put self interest over public service.

11       Under the particular facts of this case I see two

12  primary victims:  Our justice system and our community.  I've

13  mentioned the impact on the justice system.  As for our

14  community a direct consequence of corruption by officials is

15  public cynicism.  The public begins to believe that all

16  political officials and institutions are corrupt.  This belief

17  erodes public confidence in government and distorts the reality

18  that most government officials serve our community in an

19  honorable manner.  Continuing to fuel public cynicism is

20  dangerous conduct that threatens the fabric of our city, our

21  state, and our nation.  Deterrence, protecting the public, and

22  promoting respect for the law are additional factors driving

23  today's sentence.  With these words and explanation I will now

24  announce and impose sentence.

25       If you would come to the lectern, please.

1    I have listened to Mr. Sias and his counsel and I have

2 reviewed the Presentence Report.  As I mentioned in my

3 explanation, I have carefully considered the

4 18 U.S.C. § 3553(a) sentencing factors.  Pursuant to the

5 Sentencing Reform Act of 1984 it is the judgment of this court

6 that the defendant, Sammie Lee Sias, is hereby committed to the

7 custody of the Bureau of Prisons to be imprisoned for a term of

8 36 months as to each of counts one and two to be served

9 concurrently.  I find no reason this morning to depart from the

10 sentence called for by application of the advisory guidelines

11 inasmuch as the facts as found are of the kind contemplated by

12 the Sentencing Commission.

13    Mr. Sias does not have the ability to pay a fine

14 within the guideline range.  However, I have considered the

15 factors set forth in Sentencing Guideline Section 5E1.2(d) and

16 find that he does have the ability to pay a fine in the sum of

17 $5,000.  While in BOP custody, Mr. Sias shall make payments of

18 either quarterly installments of a minimum of $25 if working

19 non-UNICOR or a minimum of 50 percent of monthly earnings if

20 working UNICOR.  When released from imprisonment and while on

21 supervised release Mr. Sias shall make minimum monthly payments

22 of $200 over a period of 25 months.  Payments shall be made

23 payable to the Clerk, United States District Court.  I have

24 determined that Mr. Sias does not have the ability to pay

25 interest on this amount.  It is ordered then that the interest

1  requirement is waived.  I further order that he shall pay to

2  the United States a special assessment of $100 as to each count

3  for a total of $200 which shall be due immediately.

4         Upon release from imprisonment Mr. Sias shall be

5  placed on supervised release for a term of three years as to

6  each of counts one and two to be served concurrently.  While on

7  supervised release he shall comply with the standard conditions

8  of supervision adopted by this court and the mandatory

9  conditions required by 18 U.S.C. § 3583 which will include, but

10  not be limited to, urine testing, a prohibition against

11  possession of any firearm or other dangerous weapon, and a

12  prohibition against the violation of any law.  Further,

13  Mr. Sias shall cooperate in the collection of a DNA sample as

14  directed by the probation officer pursuant to 18 U.S.C. § 3583.

15         While on supervised release Mr. Sias shall comply with

16  certain special conditions.  I have considered the

17  18 U.S.C. § 3553 and 3583 factors and relevant policy

18  statements issued by the commission and I have determined that

19  these special conditions involve no greater deprivation of

20  liberty than is reasonably necessary to achieve the purposes of

21  sentencing.  The following special conditions are imposed.

22         Mr. Sias must provide the probation officer with

23  access to any requested financial information and authorize the

24  release of any financial information.  The probation office may

25  share financial information with the U.S. Attorney's Office.

He must pay the financial penalty in accordance with the Schedule of Payment sheet of the Judgment.  He must notify the court of any changes in economic circumstances that might affect his ability to pay his financial penalty.

He must submit his person, property, house, residence, office, vehicle, papers, computers, other electronic-communications or data-storage devices or media to a search conducted by a United States Probation Officer.  Failure to submit to a search may be grounds for revocation of release. Mr. Sias must warn any other occupants that the premises may be subject to searches pursuant to this condition.  The probation officer may conduct a search under this condition only when reasonable suspicion exists that Mr. Sias has violated a condition of supervision and that the areas to be searched contain evidence of the violation.  Any search must be conducted at a reasonable time and in a reasonable manner.

Mr. Sias must comply with the conditions of a curfew from 10 p.m. 'til 6 a.m. during the period of supervision. During this time he must remain at his place of residence at all times and shall not leave except when the leave is approved in advance by the probation officer.

The probation officer is directed to provide Mr. Sias with a written statement which sets forth all of the conditions to which the term of supervised release is subject.

Officer Brown, what is a reporting date?

1          THE PROBATION OFFICER:   60 days is a Saturday, Your

2     Honor; so we would recommend 62 days is Monday, August 21.

3          THE COURT:   I'll order that Mr. Sias is to voluntarily

4     surrender to the institution designated by the Bureau of

5     Prisons by 2 p.m. on Monday, August 21, 2023.

6          Mr. Sias, you are advised that you have the right to

7     appeal from this sentence within 14 days.  Your failure to

8     appeal within the 14-day period shall be a waiver of your right

9     to appeal.  The government may also file an appeal from this

10    sentence.  I advise you you have the right to the assistance of

11    counsel in taking an appeal and if you are unable to afford a

12    lawyer one will be provided for you.  If you so request the

13    Clerk of Court will prepare and file a notice of appeal on your

14    behalf.  In the event of appeal it will be the obligation or

15    responsibility of your counsel to continue his representation

16    on appeal unless and until relieved by order of the Court of

17    Appeals for the Eleventh Circuit.

18         Sentence has now been pronounced.  Other than any

19    objections which may have previously been stated for the

20    record, does anyone now have any objections to the Court's

21    findings of fact, conclusions of law, or to the manner in which

22    the sentence was pronounced by this Court?

23         Ms. Lyons?

24         MS. LYONS:  No, Your Honor.  Thank you.

25         THE COURT:  Mr. Owen?

1          MR. OWEN:  We don't have any objections, but Mr. Sias

2   did want to make a request about a prison location.

3          THE COURT:  Yes.  I'll be glad to make a

4   recommendation.

5          MR. OWEN:  He is requesting should he qualify and I

6   think he may for the federal prison in Estill, South Carolina.

7          THE COURT:  I will place a recommendation in the

8   Judgment for Estill.  As you know, the Bureau of Prisons is not

9   required to comply with my recommendations.  They generally do,

10  but I will place that in the Judgment.

11         MR. OWEN:  Thank you, Your Honor.

12         THE COURT:  Nothing further, then; correct?

13         THE DEFENDANT:  Thank you, Your Honor.

14         THE COURT:  I believe that concludes this morning's

15  sentencing.  Thank you all very much.

16      (The hearing is concluded.)

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

    I, Lisa H. Davenport, Federal Official Court Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of record of the digitally-recorded proceedings to the best of my ability and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


                              _____

                              Lisa H. Davenport, RPR, FCRR
                              Federal Official Court Reporter